NOT DESIGNATED FOR PUBLICATION

No. 120,211

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.T.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed May 10, 2019.
Affirmed.

*Brian L. Williams*, of Williams Law Office, LLC, of Emporia, for appellant natural father.

*Meghan K. Morgan*, assistant county attorney, and *Marc Goodman*, county attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

SCHROEDER, J.: S.T. (Father), the natural father of A.T.—born in 2015— appeals the district court's termination of his parental rights. Father contends the State failed to present sufficient evidence he was an unfit parent and his unfitness is unlikely to change in the foreseeable future. He also alleges the district court abused its discretion by determining termination was in the best interests of A.T. We find in a light most favorable to the State, the decision to terminate S.T.'s parental rights is supported by clear and convincing evidence. We affirm.

FACTUAL AND PROCEDURAL HISTORY

In August 2016, the Kansas Department for Children and Families (DCF) received a report of alleged physical neglect of one-year-old A.T. based on concerns about the condition of her mother's (Mother) home. Father was not in the home and was

1

incarcerated at the Winfield Correctional Facility. Following an investigation by DCF employees and law enforcement, A.T. was taken into police protective custody. The State filed a petition in the district court to have A.T. declared a child in need of care. The district court placed A.T. in the temporary custody of DCF. Father appeared at an adjudication hearing where he stipulated A.T. was a child in need of care, and the district court adjudicated A.T. a child in need of care. The court ordered A.T. to remain in DCF custody and ordered the parties to complete case plan tasks designed to reintegrate A.T. with Mother and Father.

By February 2017, A.T. was placed with her maternal grandmother and step-grandfather. Father was still incarcerated and was unable to complete many case plan tasks, though reintegration continued to be a viable option. Father had monthly visits with A.T. and was scheduled to be released from a prison work release facility in May 2018.

On April 5, 2018, the district court found reintegration was no longer a viable option and directed the State to move for termination of parental rights. Thereafter, the State filed a motion to terminate Mother's and Father's parental rights. The district court entered a default judgment terminating Mother's parental rights and held an evidentiary hearing on the termination of Father's parental rights in September 2018. At the termination hearing, the State presented two witnesses and Father testified in his behalf.

*The State's case*

Brooke Mosto, a Corrections Counselor at the Wichita Work Release Facility, testified she helped Father with employment opportunities and finances in order to help him reintegrate into the community. Mosto stated she worked with Father for about a year, but he did not successfully complete the program. Mosto explained Father tested positive for methamphetamine and amphetamines in November 2017 and was terminated from his job after he potentially tested positive for THC in March 2018. Ultimately, it

2

was determined the test could not be used because the temperature of the urine was not right. Then a multidisciplinary team (MDT) met to consider Father's options. Father became combative at the meeting. The MDT removed Father from the work release program and he was sent back to the Winfield Correctional Facility. Mosto testified while Father was at the work release facility, Father participated in the advanced practice group after completing drug and alcohol treatment. Mosto believed Father cared deeply for A.T. and he was focused on changing and getting out of prison to see her.

Next, Jennifer Billet, a social worker with St. Francis Community Services, testified she began working with Father's family in August 2017. Billet testified about Father's progress on the assigned case plan tasks. Father was to maintain weekly contact with St. Francis. Billet acknowledged Father took positive steps to be involved with parenting time with A.T., but he failed to progress or comply with other case plan tasks. Father was to maintain employment and provide pay stubs to St. Francis. Billet said Father had indicated he was employed, but he had provided no documentary proof of employment. Father was to allow St. Francis to conduct random drop-in visits into his home. Billet testified Father was living with his parents. St. Francis had not visited the home and could not move forward with visitation due to Father's ongoing substance abuse. Father was to abstain from drug and alcohol use, submit to drug tests, and complete a new drug and alcohol evaluation. According to Billet, Father had submitted to regular testing but had a positive hair follicle test and had admitted to recent methamphetamine use prior to a mouth swab. Billet stated Father did not schedule a new drug and alcohol evaluation after the positive test. Father was to complete a mental health intake, but Billet stated Father had not done so.

Billet also testified Father completed a parenting class and a substance abuse course while incarcerated. Father had monthly visits with A.T. during his incarceration at the work release facility, and Billet had no concerns with their interactions. Following Father's release from prison, Father was offered weekly visitation beginning July 24,

2018. Billet testified some visits scheduled before then did not end up taking place due to scheduling and miscommunication issues on the part of St. Francis. Billet said the visits went well, other than one visit in September, where Father was less active with A.T. and appeared to be nodding off. But Billet felt Father's drug use was concerning and found it significant he could not abstain from using even while incarcerated. Billet noted Father was scheduled for parole in May 2018, but his release was delayed after he was removed from the work release program. This, in turn, delayed Father's ability to work on case plan tasks and have visitation with A.T. Billet testified no other services could be given to Father at that time to help him quickly reintegrate A.T. into his home.

*Father's case*

Father testified he was in prison when A.T. was removed from Mother's home. Father was released on July 6, 2018, about three months before the termination hearing. Father testified during his time in prison he took a parenting class, completed a drug and alcohol evaluation, and maintained contact with St. Francis. Father said he wanted to be involved in the case and see A.T. whenever possible. Father stated visits with A.T. went well at the work release facility and they had developed a strong bond. Father stated since his release from prison, he got a job at Simmons and had missed no appointments with St. Francis. After his release, Father moved in with his parents in Emporia and had his own room there. Father said there was also space for A.T. and her grandparents loved her and wanted her at their home. Father attended all scheduled visits and wanted to see A.T. as much as possible. Father testified his parenting class taught him how to reintegrate with A.T. with minimal disruption following his incarceration and he had applied these lessons during visitation.

Father testified he completed a drug and alcohol evaluation and had recently had his first outpatient therapy session. Father said he had used drugs since he was a teenager and he was going through drug treatment for the first time. Father said he wanted to move

4

forward, take care of A.T., and keep her from being exposed to drugs. But Father admitted, contrary to his case plan requirements and the conditions of his parole, he had used methamphetamine and marijuana with Mother about two weeks before the termination hearing and had also done so two days before the hearing. Father asked the court for additional time to work on the reintegration process, focusing on his attempts at making positive changes in his life and noting he had never before progressed this far in drug treatment.

*District court decision*

In reviewing the evidence at the close of the termination hearing, the district court characterized it as "a story of two cases." The court found while Father was incarcerated, he did everything he could to spend time with A.T. and took advantage of the opportunities available to him. But the court found the loss of Father's job due to drug use and his removal from work release resulted in "a domino effect" causing Father to lose two months of working on his case plan tasks and time with A.T. The court noted once Father got out of prison, he made every effort to spend time with A.T. and there was "no doubt" Father had "very deep feelings" for her. The court specifically stated its decision was not based on Father's visits with A.T., which were the "shiny spot in this case." The court found that while Father had complied with some case plan tasks, he had not complied with the requirement he abstain from drug and alcohol use and had even admitted to using drugs a couple of days before the termination hearing. Ultimately, the district court found by clear and convincing evidence Father was unfit by reason of conduct or condition which rendered him unable to properly care for A.T. and the conduct or condition was unlikely to change in the foreseeable future. The district court also considered the physical, mental, and emotional health of A.T. and determined termination of Father's parental rights was in A.T.'s best interests.

ANALYSIS

We begin with some general principles governing proceedings under the Revised Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq. A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2018 Supp.38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2018 Supp. 38-2269(b).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, a rational fact-finder could have found that decision "highly probable, i.e., [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved for the State's benefit.

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g)(1). As directed by the language of K.S.A. 2018 Supp. 38-2269(g)(1), the district court gives

6

"primary consideration to the physical, mental[,] and emotional health of the child." The district court makes that determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

*Statutory factors considered*

Here, the district court found four statutory factors had established Father's unfitness:

- K.S.A. 2018 Supp. 38-2269(b)(3)—"the use of intoxicating liquors or narcotics or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;"
- K.S.A. 2018 Supp. 38-2269(b)(5)—"conviction of a felony and imprisonment;"
- K.S.A. 2018 Supp. 38-2269(b)(7)—"failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; " and
- K.S.A. 2018 Supp. 38-2269(b)(8)—"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

Father specifically challenges the district court's finding under K.S.A. 2018 Supp. 38-2269(b)(7) that St. Francis made reasonable efforts to complete reintegration, as well as the court's finding that his unfitness was unlikely to change in the foreseeable future.

7

The evidence presented at the termination hearing established Father was convicted of distributing methamphetamine and was incarcerated for almost the entirety of A.T.'s case and life. While Father was incarcerated and working at the work release facility, he tested positive for drugs in November 2017 and later lost his work-release job based on another potentially positive test. Father's drug use ultimately resulted in his removal from the work release facility and placement back in prison, which delayed his ability to have visitation with A.T. and work toward reintegration. After Father's release from prison in July 2018, he continued to use illegal drugs, even admitting to drug use two days before the termination hearing. Father knew the termination hearing was set and still chose to use drugs.

Next, Father contends St. Francis did not make reasonable efforts to reintegrate him with A.T. following his release from prison. Father points to the July 2018 visits that did not take place as proof of St. Francis' failure, claiming these missed visits interrupted and slowed his progress toward reintegration. Approximately 18 days passed from the time Father was released and started his visits on July 24, 2018. We find the time to start his visitation did not detrimentally interfere with his opportunity to reintegrate with A.T.

The language in K.S.A. 2018 Supp. 38-2269(b)(7) imposes an obligation upon the relevant social service agencies to expend reasonable efforts toward reintegrating the child with his or her parents. To that end, the social service agencies should attempt to help the parent accomplish case objectives designed to correct the parent's conduct or condition that caused removal of the child from the home. Contrary to Father's claim, the record is replete with examples of St. Francis' reintegration efforts and management of Father's case plan tasks, which included transporting A.T. to visit Father and making special arrangements to increase the amount of visitation allowed at the work release facility. Billet testified the July 2018 visits did not take place due to miscommunication and scheduling issues. The mere fact St. Francis was not able to facilitate these visits does not negate the numerous and reasonable efforts made for Father. Any claim St.

8

Francis failed to make reasonable efforts to reintegrate Father and A.T. is contradicted by the record.

Notably, the district court's decision to terminate was not based on Father's visitation with A.T. but instead was based primarily on Father's continued drug use. The court also acknowledged Father failed to comply with the reintegration plan noting, among other issues, Father failed to do the mental health intake and attend therapy. From the evidence outlined above, we must conclude a rational fact-finder could determine to a high probability that Father was unfit to parent A.T. at the time of the termination hearing in the ways identified by the district court since drug use was a continuing problem.

Given the totality of the circumstances in the record, we find sufficient support for the district court's determination Father's unfitness was unlikely to change in the foreseeable future. A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion). Father had a prior felony drug conviction that resulted in his incarceration for much of A.T.'s life and this case. Although Father took some positive steps while incarcerated, he was unable to refrain from drug use while on work release privileges in prison. Ultimately, his work release privilege was revoked. Once released from prison, Father continued to use drugs and, even knowing his parental rights were at risk, chose to use drugs two days before the termination hearing. His past drug use and current drug use are active indicators of his future conduct.

However, Father claims his previous setbacks are not indicative of future drug use. Father notes the termination hearing took place less than three months after his release from prison, and he suggests the district court should have given him additional time to address his drug addiction and prove he could remain drug free. Father argues the court ignored all the positive progress he made while incarcerated and only focused on his prior

conviction and recent drug use. Father argues additional time to work on his reintegration tasks would do little to prejudice A.T. because she is currently placed with her grandparents. But Father fails to acknowledge that while incarcerated in prison where drugs are prohibited, he still used drugs to A.T.'s detriment. This showed Father's inability to put the needs of his child over his perceived need to use illegal drugs.

We examine the "foreseeable future" from the perspective of a child. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame reasonable to them. 50 Kan. App. 2d at 1170; see *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's"). At the time of the hearing, A.T. was three years old and the case had been ongoing for two years. Father argues he only needs "[a] small amount of additional time" to show the possibility of reintegration. While "a small amount" of time may appear insignificant to Father, it is a significant amount of time to A.T. We agree with the district court's decision declining Father's request for additional time. Father had the time in prison and after his release to learn to be drug free. Father chose to use drugs instead of abstaining for A.T.'s benefit.

*Best interests*

Finally, we look at the district court finding A.T.'s best interests would be served by terminating Father's parental rights. The district court is in the best position to make findings on the best interests of the child, and we will not disturb its judgment unless we find the determination amounts to an abuse of judicial discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). Father argues the district court focused only on Father's past and recent substance abuse in making its best interests finding. Father claims the court failed to give adequate weight to the progress he made toward

10

reintegration while in prison and since his release, namely his recent participation in drug treatment and his "strong bond" with A.T.

We are not persuaded by Father's arguments. Instead, we are convinced the district court evaluated all the testimony and evidence before determining it is in A.T.'s best interests to terminate Father's parental rights. In reaching this conclusion, the district court noted the case had been pending for two years and it could not rely on Father's behavior to change given his past conduct and continued drug use. A reasonable person could have found the same and concluded termination was in the best interests of A.T.

Having reviewed the record, we are convinced a rational fact-finder would have found by clear and convincing evidence Father is unfit and his unfitness is unlikely to change in the foreseeable future. The district court did not abuse its discretion in finding termination of Father's parental rights is in A.T.'s best interests. We affirm.

Affirmed.

\* \* \*

ATCHESON, J., dissenting: The majority upholds the determination of the Lyon County District Court that S.T.'s inability to parent his daughter A.T. was unlikely to change anytime soon based mostly on an aphorism—that past conduct indicates future behavior—and little in the way of actual evidence. That faulty conclusion supplied a necessary legal component for the termination of S.T.'s parental rights. The State produced insufficient evidence on the point, especially given the heightened burden of proof applicable in these cases. And bumper sticker jurisprudence cannot excuse a dearth of evidence when it comes to extinguishing fundamental constitutional rights. I respectfully dissent and would reverse and remand for further proceedings.

11

As the moving party in this action, the State had to prove S.T. to be an unfit parent to A.T. and that A.T.'s best interests would be served by terminating his parental rights. Unfitness entails two components: (1) The parent has to be "unfit" at the time of the termination hearing; and (2) the condition of unfitness must be "unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a). The district court had to find each component of unfitness proved by clear and convincing evidence. K.S.A. 2018 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). On appeal, we review those determinations by asking whether a rational fact-finder could have found them "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). We do not weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. And we credit any disputed evidence in the State's favor as the prevailing party.

The significance of the right at stake cannot be overstated. The bond between parent and child and the concomitant relationship entails a liberty interest protected in the Fourteenth Amendment to the United States Constitution. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. at 697-98. The right of a parent to that relationship and participation in his or her child's upbringing has been characterized as fundamental. *Santosky*, 455 U.S. at 753. By the same token, the right is not boundless, and the State may exercise a *parens patriae* interest to intercede to protect the child's physical or emotional well-being. See K.S.A. 2018 Supp. 38-2201(a) (proceedings under Revised Kansas Code for Care of Children "deemed to be pursuant to the parental power of the state"); *Santosky*, 455 U.S. at 766. The heightened burden of proof on the State derives from the importance of the familial interests at issue in a termination hearing and is constitutionally mandated as a matter of due process. 455 U.S. at 769-70.

12

Parental rights once judicially terminated can never be redeemed. The severance is irrevocable.

At the time of the termination hearing, S.T. was unfit, and he conceded as much. S.T. had been and continued to be addicted to methamphetamine. He persistently, if irregularly, used methamphetamine and had a history of abusing alcohol and sometimes other drugs for more than 10 years.

S.T. was in prison when A.T. was born because he had been convicted of possession of methamphetamine with the intent to distribute. While there, S.T. was placed in a work release program and arranged regular visits with A.T., which the record suggests was an unusual privilege. Nonetheless, S.T. tested positive for illegal drugs and was removed from work release and lost visitation with A.T. S.T.'s mistake also delayed his release from prison for several months.

Shortly before S.T. was released from prison in July 2018, the State moved to terminate his parental rights. The district court held an evidentiary hearing on September 27 to consider termination. The evidence showed that S.T., who was then 28 years old, quickly got a job at a local manufacturing plant and had already earned a promotion and a raise. S.T. was living with his parents in their home. He testified that A.T., who was then about two-and-a-half years old, would have her own room there. S.T. indicated that he viewed living with his parents as a temporary circumstance. The State offered no evidence that those living arrangements were unsuitable. S.T. had weekly parenting sessions with A.T. that generally went well, and the two appeared to have a good relationship.

But S.T.'s drug addiction continued to be a problem, as he acknowledged. S.T. tested positive for methamphetamine in August. He told his caseworker in mid-September that he had spent the preceding weekend with A.T.'s mother and the two of

13

them used methamphetamine. At the hearing, the assistant county attorney asked S.T. when he had last used drugs. He replied that he had used methamphetamine and marijuana two days earlier. Nobody asked S.T. any follow-up questions, so we don't know the circumstances.

S.T. testified that he had begun abusing drugs as a teenager. He said he completed a drug education course in prison geared toward the general inmate population, since no substance abuse treatment program was available to him as an addict. S.T. testified that earlier in September he had started an outpatient treatment program—the first such program he tried—and had been to one session.

J.S., A.T.'s mother, was a spectral player throughout the case, sometimes mentioned but rarely present in the district court. After A.T. was born in March 2016, she lived with J.S. and J.S.'s son A.M. who is about nine years older than A.T. and is her half-brother. The children were removed from J.S.'s custody in August 2016 because of her general neglect and the unsanitary condition of their home. J.S. is an active drug addict and eventually stopped participating in the family reintegration plan designed for her and failed to appear for court hearings. She effectively defaulted in the termination proceeding. J.S.'s parental rights have been terminated, and she is not a party to this appeal.[1]

[1]Based on the appellate record, A.T. was a normal, well-adjusted two-and-a-half year-old at the time of the termination hearing. A.T. and A.M. have lived with their maternal grandmother and her husband, since they were removed from J.S.'s custody. The couple's laudable efforts to insure the children's welfare have not gone unnoticed.

In the journal entry terminating S.T.'s parental rights, the district court cited four statutory grounds for his unfitness:  (1) his use of "narcotic or dangerous drugs" rendering him "unable to care for" A.T., under K.S.A. 2018 Supp. 38-2269(b)(3); (2) his conviction of a felony and imprisonment, under K.S.A. 2018 Supp. 38-2269(b)(5); (3) the failure of

14

family reintegration despite the reasonable efforts of appropriate social service agencies, under K.S.A. 2018 Supp. 38-2269(b)(7); and (4) his "lack of effort" to adjust his circumstances to meet A.T.'s needs, under K.S.A. 2018 Supp. 38-2269(b)(8). The district court relied on S.T.'s continuing abuse of methamphetamine and marijuana as the factual basis for his present unfitness at the time of the termination hearing. A single statutory ground may be sufficient to support parental unfitness. And I have no quarrel with the conclusion that S.T.'s unchecked methamphetamine addiction left him unable to parent A.T. in September 2018. As I mentioned, S.T. conceded as much in his testimony—a candid bow to practical realities, though, not strictly speaking, a binding legal concession. Someone using methamphetamine on a regular basis could be arrested suddenly and without warning and then prosecuted, convicted, and likely incarcerated. That uncertainty and those consequences make active methamphetamine abuse incompatible with capable parenting, wholly apart from the deleterious toll long-term abuse commonly takes on the physical and mental capacity of the abuser.[2]

[2]I don't believe S.T. was unfit as provided in K.S.A. 38-2269(b)(5), requiring conviction of a felony *and* incarceration. As I understand that ground, a parent may be considered unfit because he or she is serving an extended prison sentence (on a felony conviction) and, therefore, cannot fulfill conventional and necessary parental obligations to a minor child. See *In re A.L.E.A.*, No. 116,276, 2017 WL 2617142, at *3-4 (Kan. App.) (unpublished opinion), *rev. denied* 307 Kan. 986 (2017). Because S.T. had been released from prison by the time of the termination hearing, that ground did not apply to him. The conviction itself might be considered as circumstantial evidence bearing on other reasons S.T. could be unfit.

The crux of the termination decision lies in whether S.T.'s unfitness was unlikely to change in the foreseeable future. The State had to prove that statutory requirement by clear and convincing evidence, as well. The district court summarized the factual circumstances of S.T.'s ongoing drug abuse to conclude, without anything more, that his unfitness would be unlikely to change. In both its bench ruling and the journal entry, the district court then recited, "Past performance is the best indicator of future performance." The district court stopped there, as if that aphorism sewed things up.

The majority essentially replicates the district court's mistake after recognizing the genesis of the saying in *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). In *Price*, this court commented: "Even if the State's evidence in this case might lack expert prognostic evidence, we are satisfied continued unfitness can be judicially predicted from a parent's past history without expert opinion testimony." 7 Kan. App. 2d at 483. The legal context in *Price* explains the comment and helps illustrate its marked limitation, especially in circumstances like this case. Nonetheless, invocation of the past as proof of the future has become a mainstay in termination cases.

The father in *Price* appealed the termination of his parental rights on the grounds his son could not have been a deprived child (the equivalent of a child in need of care under the current code) because the State took the child into protective custody at birth. Since the baby had not actually been deprived, father argued the State failed to establish a legal prerequisite to terminating his parental rights. The *Price* court rejected the argument by pointing out the statutory scheme did not require giving physical custody of newborns to parents when doing so predictably could cause the children harm. The predictability of physical or emotional harm based on circumstantial evidence was sufficient to find the newborn to be deprived and, thus, to initiate proceedings to have the child declared a ward of the State and for temporary placement apart from the parents. In that case, the baby likely had special needs requiring even more attentive care than a typical newborn. 7 Kan. App. 2d at 478, 480-81.

The court recognized a parent's present capacity to meet a child's basic physical and emotional needs bore on whether the child was deprived or in need of care. The issue, however, focused on the status of the child rather than the capacity of the parent, especially his or her future unfitness. 7 Kan. App. 2d at 483. Having disposed of the specific legal challenge father raised on appeal, the court did go on to discuss father's unfitness as a component of the termination of his parental rights. In that context, the

court made its observation that "continued unfitness can be judicially predicted from a parent's past history." 7 Kan. App. 2d at 483.

Linguistic redundancy aside ("past" history being the only kind of history there is), the statement doesn't really provide much in the way of precedential authority or guidance. First, of course, it is dicta. See *State v. Hankins*, 304 Kan. 226, 237, 372 P.3d 1124 (2016) ("dicta . . . binds nobody"). Second, we have no idea what facts the *Price* court considered in that case as undergirding its suggestion. The court rather deliberately didn't tell us. *Price*, 7 Kan. App. 2d at 478 ("We are satisfied from the record that the evidence, which we need not reiterate, was more than sufficient to clearly and convincingly prove the father unfit to have the custody of this child."). So it isn't really possible to apply the observation by analogy to the factual circumstances of another case. See *State v. Lowe*, No. 110,103, 2015 WL 423664, at *11 n.5 (Kan. App. 2015) (unpublished opinion) (Atcheson, J., dissenting) (noting difficulty in applying holding in *State v. Ransom*, 288 Kan. 697, 715-16, 207 P.3d 208 [2009], as "analogous precedential authority" because opinion omits governing facts). Finally, the *Price* court did not purport to create a legal presumption, let alone a categorical rule, in which past dictates future. And the notion shouldn't be deployed that way.

What the *Price* court articulates in a conveniently quotable way is the sort of water-is-wet idea that how a person *has behaved* may sometimes be a decent indicator of how he or she *will behave*. In other words, past conduct offers some circumstantial evidence of future conduct. But the evidentiary chain often may be constructed of tissue paper rather than tempered steel. Several irregular and infrequent occurrences spread over a long time may not be especially predictive, depending on the particular conduct. (For example, we probably shouldn't conclude a person is an active drug abuser because he or she used cocaine several times over the course of a decade.) Or an intervening event may strongly suggest the chain has been materially weakened or broken altogether. (For example, a person recently diagnosed with bipolar disorder and engaged in course of

17

therapy and medication should not be considered floridly ill based on his or her past behavior.)

The evidence here shows that S.T. sought out and began a parent-child relationship with A.T. to the extent he was able while in prison. That effort was cut short when S.T. used illegal drugs during work release, continuing a pattern of abuse going back years. In the three months after he was discharged from prison leading up to the termination hearing, S.T. obtained gainful employment, found a place to live that included space for A.T., and began a drug treatment program—a first for him. Those mark substantial steps toward forging a healthy familial relationship with A.T., and they are steps S.T. could not have undertaken before his release from prison.

S.T. could have initiated drug treatment six weeks earlier, a delay the district court and the majority strongly count against him. He also used methamphetamine three times during that three-month period. Those circumstances adequately support the district court's finding of present unfitness.

But the State offered insufficient evidence to convince a reasonable fact-finder that S.T.'s unfitness was unlikely to change in the foreseeable future. First, of course, the State offered no evidence that S.T.'s employment and residence were insufficient or inappropriate. Likewise, the weekly visits between S.T. and A.T. pointed toward a successful, ongoing relationship. More particularly to the district court's reasoning on unfitness, the State offered no evidence that S.T. had so intractable a drug problem that he likely would fail in his treatment program. We similarly lack any evidence on how long S.T.'s treatment program would take or how long a period of demonstrable sobriety might be required afterward to permit full integration of S.T. and A.T. as a family.[3]

[3]A parent's successful completion of a drug treatment program would not itself alleviate the condition of unfitness. Sobriety over time would be the true test. But an otherwise suitable parent could undertake an expanding custodial role in his or her child's

life with appropriate supervision ultimately leading to familial unification and an end to court intervention. See K.S.A. 2018 Supp. 38-2255(d)(1) (custody of child to State); K.S.A. 2018 Supp. 38-2258(a), (d) (recognizing State may place child in home of parent or relative, subject to conditions promoting welfare of child).

The record evidence simply does not sufficiently support unlikelihood of change as a necessarily component of unfitness and, therefore, to terminate S.T.'s parental relationship with A.T. as a fundamental, constitutionally protected right. The district court should have denied the State's request for termination and afforded S.T. more time to complete the designated plan, including drug treatment, for gaining full custody of A.T.

Neither the district court nor this court can augment an insufficient record with a modestly clever saying about how past predicts future. As this court recognized earlier this year, that sort of reasoning-by-slogan can be improperly wielded in these cases as a categorical rule that "once a drug abuser, always a drug abuser." *In re L.D.*, No. 119,613, 2019 WL 257979, at *5 (Kan. App. 2019) (unpublished opinion). In *In re L.D.*, we rejected such incantations as grounds for termination because "an addict entering treatment and achieving sobriety during a child in need of care proceeding would be legally unable to overcome a history of substance abuse." As we pointed out, "an entirely backward looking analysis disserves the whole point of rehabilitative efforts to reintegrate families." 2019 WL 257979, at *5. The same considerations are at play here.

I recognize, as the majority says, the "foreseeable future" for parental change should be measured from the perspective of the child. K.S.A. 2018 Supp. 38-2201(b)(4). Statutory "child time" differs from adult time because for young children a month or a year reflects a greater portion of their lives than the same period would for older teens or adults, and that difference in perception typically favors prompt case disposition achieving permanency. *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re A.L.E.A.*, No. 116,276, 2017 WL 2617142, at *4 (Kan. App.) (unpublished opinion), *rev.*

19

*denied* 307 Kan. 986 (2017). This time frame becomes particularly significant when a family unit has been shattered, repair of that unit remains uncertain, and the child lacks a permanent home as a ward of the State. Children in state custody often wind up moving from foster placement to foster placement as these cases progress, leaving them adrift both physically and emotionally. A.T.'s particular situation militates against giving child time a great deal of weight—she has been living with her maternal grandmother throughout these proceedings in a stable, supportive environment in which she has, by all accounts, done well.

In closing, I offer several comments by way of limitation on what I suggest as the proper disposition here. If the evidence in a given case shows that a parent chronically abused alcohol or other drugs and had refused to participate in treatment programs or had failed in them either before or during the child in need of care proceedings, that history properly could be weighed against the parent notwithstanding his or her declared intentions to do better. Similarly, a parent who procrastinates in seeking professional help for a substance abuse problem during the case and finally does so just before a termination hearing—a year or 18 months into the process—typically shouldn't get much credit for the belated effort. Finally, a district court need not afford dispensation to the parent continually denying any active substance abuse problem in the face of clear contrary evidence. But those situations differ materially from where S.T. stood last September as he sought more time from the district court to become a fit parent.

I have no way of knowing whether S.T. would have succeeded in beating his drug addiction. Maybe he would have failed. But both he and A.T. were due more of a chance than they were given for him to succeed or fail.